Case No. 17-6216

# United States Court of Appeals
# for the Sixth Circuit

_____

LIBERTARIAN NATIONAL COMMITTEE, INC.; THE LIBERTARIAN
PARTY OF KENTUCKY; DAVID PATTERSON

*Plaintiffs/Appellants*

v.

TERRY HOLIDAY, in his official capacity; DAVID COUCH, in his official
capacity; RUSTY CHEUVRONT; DONNA MOORE CAMPBELL; HILMA
PRATHER; DR. SUVAS DESAI; HEIDI MARGULIS; ANGEL
CAIN; LAURA LADD, in their official capacities; SHAE HOPKINS, in her
official and individual capacity; MIKE BROWER, in his official and individual
capacity; TIM BISCHOFF, in his official and individual capacity; WILLIAM
GOODMAN, in his official and individual capacity; DEIDRE CLARK, in her
official and individual capacity

*Defendants/Appellees*

_____

On Appeal from Orders of the United States District Court
Eastern District of Kentucky, at Lexington
Civil Action No. 3:14-cv-00063

## BRIEF OF APPELLANTS

_____

Thomas B. Bruns (KBA #84985)      Robert A. Winter, Jr. (KBA #78230)
4750 Ashwood Drive, Suite 200       PO Box 175883
Cincinnati, Ohio 45241                    Fort Mitchell, KY 41017-5883
513-312-9890                                859-250-3337
tbruns@bcvalaw.com                      robertawinterjr@gmail.com

*Attorneys for Plaintiffs/Appellants*

i

## CORPORATE DISCLOSURE STATEMENT

Pursuant to FRAP 26.1, Plaintiffs/Appellants Libertarian National Committee, Inc., The Libertarian Party of Kentucky, and David Patterson (collectively, the "Plaintiffs") are not subsidiaries or affiliates of a publicly owned corporation.  There is no publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome.

# TABLE OF CONTENTS

**CORPORATE DISCLOSURE STATEMENT**.....................................................ii

**TABLE OF CONTENTS** .............................................................................iii

**TABLE OF AUTHORITIES** ........................................................................iv

**STATEMENT CONCERNING ORAL ARGUMENT** ..................................viii

**JURISDICTIONAL STATEMENT**.................................................................1

**STATEMENT OF THE ISSUES**......................................................................1

**INTRODUCTION**..............................................................................................2

**STATEMENT OF THE CASE AND FACTS**...................................................3

    **I.   Allegations set forth in the Amended Complaint, construed in the manner most favorable to the Plaintiffs** ...........................................3

    **II. Evidence established of record for the Summary Judgment Proceedings 15**

**SUMMARY OF THE ARGUMENT** ..............................................................35

**ARGUMENT** ....................................................................................................35

    **I.   The District Court erred in granting partial dismissal to Defendants and partial summary judgment as to the criteria themselves** ...............35

    **II. The District Court erred in granting summary judgment to the other individual capacity Defendants** ..........................................................50

    **III.   The District Court erred in failing to grant the FRCP 59(e)/Motion for Reconsideration and/or Motion to Amend**...................................59

**CONCLUSION**.................................................................................................60

**CERTIFICATE OF COMPLIANCE** .............................................................61

**CERTIFICATE OF SERVICE** ......................................................................61

**APPENDIX -- DESIGNATION OF THE DISTRICT COURT RECORD** .......i

# TABLE OF AUTHORITIES

## Cases

*Allegheny Pittsburgh Coal Co. v. Commission of Webster Cty.*, 488 U.S. 336 (1989)....................................................................................................47

*American Party of Arkansas v. Jernigan*, 424 F. Supp. 943 (E.D. Ark. 1977).......46

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986)....................................54

*Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666 (1998) ............. *passim*

*Arons v. Donovan*, 882 F. Supp. 379, 389-390 (D.N.J. 1995) ................................62

*Arons v. New Jersey Network*, 775 A.2d 778, 784 (NJ Super. 2001).....................40

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)...........................................................52

*Bailey v. Callaghan*, 715 F.3d 956 (6th Cir. 2013)...................................................59

*Baldwin v. Hale*, 68 U.S. (1 Wall.) 223, 233 (1863) ...............................................49

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)............................................52

*Board of Regents v. Roth*, 408 U.S. 564 (1972). ............................................. 50, 51

*Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 565 (6th Cir. 2016)................53

*Carey v. Wolnitzek*, 614 F.3d 189, 202 (6th Cir. 2010) .................................... 55, 63

*Chandler v. Georgia Public Telecommunications Com.*, 917 F.2d 486 (11th Cir. 1990)..................................................................................................62

*Children First Found., Inc. v. Legreide*, 373 Fed. Appx. 156 (3d. Cir. 2010)........58

*Citizens United v. FEC*, 558 U.S. 310, 340 (2010) .................................................57

*Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 811 (1985) .... 58, 59

*Daugherty v. Campbell*, 935 F.2d 780, 784 (6th Cir. 1991)....................................64

*Davis v. FEC*, 554 U.S. 724 (2008) ........................................................38

*Dawson v. Dorman,* 528 Fed. Appx. 450, 452 (6th Cir. 2013) ...............54

*Denver Area Educ. Telcoms. Consortium v. FCC*, 518 U.S. 727 (1996)... 55, 63, 64

*Greaves v. State Bd. of Elections of North Carolina*, 508 F. Supp. 78 (E.D.N.C. 1980) ..............................................................................................45

*Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 666 (1966) ............. 39, 47

*Harris v. City of Circleville*, 583 F.3d 356, 366-67 (6th Cir. 2009).......................64

*Intera Corp. v. Henderson*, 428 F.3d 605, 619-20 (6th Cir. 2005) .........................65

*Jenness v. Fortson*, 403 U.S. 431, 437-438 (1971) .................................................45

*Jones v. Flowers*, 547 U.S. 220, 235 (2006)..........................................................50

*Kennedy v. City of Cincinnati*, 595 F.3d 327, 337 (6th Cir. 2010).........................64

*Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008) .......................................53

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist*., 508 U.S. 384 (1993) .......56

*Lee v. Keith*, 463 F.3d 763 (7th Cir. 2006) .............................................................45

*Lendall v. Bryant*, 387 F. Supp. 397 (E.D. Ark. 1974)...........................................46

*Lendall v. Jernigan*, 424 F. Supp. 951 (E.D. Ark. 1977) .......................................46

*Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 593 (6th Cir.2006) 41, 42, 43

*Lubin v. Panish*, 415 U.S. 709 (1974) ....................................................................39

*Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). ........................................... 49, 51

*McGowan v. Maryland*, 366 U.S. 420, 425 (1961) .................................................44

*Mesa v. White*, 197 F.3d 1041 (10th Cir. 1999)......................................................59

*Nolfi v. Ohio Ky. Oil Corp.*, 675 F.3d 538, 552 (6th Cir. 2012).............................65

*Obie v. North Carolina State Bd. of Elections*, 762 F. Supp. 119 (E.D.N.C. 1991) .................................................................................................................45

*Penn, LLC v. Prosper Bus. Dev. Corp.*, 600 Fed. Appx. 393, 403 (6th Cir. 2015)..66

*Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)...............44

*Pittsburgh League of Young Voters Educ. Fund v. Port Auth.*, 653 F.3d 290 (3d Cir. 2011)..................................................................................................58

*Police Department of the City of Chicago v. Mosley*, 408 U.S. 92 (1972) .............48

*R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) ................................................56

*Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000) .................53

*Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 82 (1st Cir. 2004) ......................56

*Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 86 (1st Cir. 2004) .......................59

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) . 56, 58

*Ross v. Moffitt*, 417 U.S. 600, 609 (1974) ................................................................44

*San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 60 (1973) ..........44

*Sioux City Bridge Co. v.  Dakota County*, 260 U.S. 441 (1923) .............................47

*Socialist Labor Party v. Rhodes*, 318 F. Supp. 1262 (S.D. Ohio 1970).................46

*Storer v. Brown*, 415 U.S. 724, 737 (1974) .............................................................41

*Thomas v. Cohen*, 304 F.3d 563, 576 (6th Cir. 2002) .............................................50

*United States v. O'Brien*, 391 U.S. 367 (1968).......................................................48

*Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)...................................47

*Ward v. Polite*, 667 F.3d 727 (6th Cir. 2012) ..........................................................59

*Wesley v. Campbell*, 779 F.3d 421, 428, 433 (6th Cir. 2015) ................................63

*Williams v. Rhodes*, 393 U.S. 23, 24-25 (1968)................................................ 45, 48

## Statutes and Rules:

### Statutes

28 U.S.C. § 1291 ..........................................................................................................1

28 U.S.C. § 1331 ..........................................................................................................1

### Rules

FRCP 59(e) ...................................................................................................................65

FRAP 32 …………………………………………………………………….... 61

6th Cir. R. 32 ………………………………………………………………….. 61

6th Cir. R. 30 ……………………………………………………………………… i

## STATEMENT CONCERNING ORAL ARGUMENT

The District Court misapprehended certain material factual issues. Consequently, clarification and a discussion of the record are warranted by oral argument, something denied to Plaintiffs in the Court below. In addition to the factual issues, the important constitutional issues presented warrant oral argument.

## JURISDICTIONAL STATEMENT

The District Court had federal question jurisdiction over Plaintiffs' federal constitutional claims under 28 U.S.C. §1331.

On September 29, 2017, the District Court entered summary judgment disposing of all remaining claims in the case. [Memorandum Opinion and Order, RE#99, PageID#4169-4183; Judgment, RE#100, PageID#4184].

A timely notice of appeal was filed on October 16, 2017. [Notice of Appeal, RE#102, PAGEID#4205-4206]. Accordingly, this Court has jurisdiction over Plaintiffs' appeal under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

This appeal presents the following questions:

(1)   First, did the District Court err in granting, in part, Defendants' Motion to Dismiss/Motion for Judgment on the Pleadings [RE#42, PAGEID#1535-1587], where its decision was contrary to law?

(2)   Second, did the District Court err in granting summary judgment to Defendants on all remaining claims [RE#99, PAGEID#4169-4183], where its decision was contrary to law?

(3)   Third, did the District Court err in denying Plaintiffs' Motion to Reconsider/Amend [RE#98, PAGEID#4161-4168], when it was based on new evidence obtained in depositions?

## INTRODUCTION

This case involves claims surrounding the Kentucky U.S. Senate televised debate hosted by Defendants on October 13, 2014. That year, for the first time, Defendants employed stringent "criteria" for participation in the Kentucky Authority for Educational Television's ("KET") candidate forums/debates. By Defendants' own admission, the reasoning for imposing these new criteria was to prevent what happened in 2012, which is that certain candidates running in federal races, who espoused anti-abortion views, appeared on KET programming.

The evidence established that in the Democrat and Republican primaries leading up to the 2014 general election, certain candidates emerged who espoused views Defendants did not want presented to the KET audience. Following the conclusion of the primary process, Defendants acted on their concern at the same time they became desirous of hosting the only statewide debate between U.S. Senator Mitch McConnell, the Republican nominee, and Kentucky Secretary of State Allison Lundergan Grimes, the Democrat nominee. Notwithstanding the fact that Defendants sent their only invitations to Senator McConnell and Secretary Grimes based only upon the candidates' qualification on the ballot for the general election, Defendants changed the criteria for inviting, or not inviting, the only other candidate who also qualified to appear on the ballot for the general election. Specifically, to make sure no one else appeared on the debate stage, Defendants

repeatedly altered, modified and kept secret the invitation criteria until they were certain the criteria would not be met.

This lawsuit followed. The District Court denied a preliminary injunction the afternoon before the debate, and Plaintiffs amended their complaint to include individual capacity claims against certain of the Defendants for viewpoint discrimination and the violation of clearly established constitutional rights.

The District Court granted Defendants' Motion to Dismiss in part in late 2015, limited discovery was conducted, and then the District Court granted Defendants' Motion for Summary Judgment.

This Court should reverse.

## STATEMENT OF THE CASE AND FACTS

### I.     Allegations set forth in the Amended Complaint, construed in a manner most favorable to the Plaintiffs

Defendant William Goodman ("Goodman") is an editor and host of *Kentucky Tonight*, the television program at issue here.[1] Goodman and the other individual capacity Defendants were collectively named the "KET Programming Defendants" in the Amended Complaint, and each was sued in both their individual and official capacities.[2]

---

[1] (Amended Complaint, RE#41, ¶6, PAGEID#1465).
[2] (*Id.*).

3

Goodman likewise was involved in the actions and approvals complained of.[3]

On January 27, 2014, Mike Brower ("Brower"), Goodman's boss, circulated an intra-office email regarding the upcoming election season and the procedure for inviting candidates to participate in the debates to be hosted by KET.[4]  Brower, the Senior Director for Production Operations at KET, noted that the goal of the procedure was "**to have a way to defend not including only the most extreme cases**, **like out of state crusaders, or wacky people.**" *Id.*  (Emphasis added). Throughout that email, Mr. Brower uses the terms "we" and "our," and Goodman was copied on that email, leading to the reasonable inference that he was involved in its drafting.

On January 31, 2014, Brower emailed KET's attorney, Todd Gray, about proposed criteria for candidates to meet in order to participate in KET-programmed debates.[5]  Again, the use of "we" and "our" is found throughout that email, and Goodman is copied on it, presenting a reasonable inference that he was intimately involved in the criteria process.[6]  That email likewise contains references to the

---

[3] (*Id.* at ¶7, PAGEID#1466).
[4] (*Id.* at ¶14, PAGEID#1467, RE#41-1, PAGEID#1488).
[5] (*Id.* at ¶15, PAGEID#1467-1468, RE#41-2, PAGEID#1490).
[6] (*Id.*).

4

intent of the Defendants in enacting the criteria and the desire to exclude an

"eccentric" candidate.[7]

The proposed criteria would have required candidates to satisfy **one of four**

of the following: making public statements on at least three issues; raising $10,000;

receiving more than incidental press coverage; <u>OR</u> receiving at least 5% or more in

polling.[8] These proposed criteria were a significant departure from past years,

where simply gaining ballot access would qualify for participation in KET's

debates.[9] Plaintiffs qualified under these criteria.[10]

On February 4, 2014, KET invited candidates for the upcoming primary U.S.

Senate race to participate in debates.[11] Each February 4th invitation to the primary

candidates included an additional prospective invitation to the general election

debates on October 13, 2014 for the winners of the primaries.[12] The only criterion

for these invitations was the candidates qualify to be on the ballot for the general

election.[13]

On March 5, 2014, Mr. Brower sent an email to Shae Hopkins ("Hopkins"),

the Executive Director of KET, detailing the **"finalized criteria"** for candidates

---

[7] (*Id.*).
[8] (RE#41-2; PAGEID#1490-1491).
[9] (*Id.*, RE#41, ¶12, PAGEID#1466-1467).
[10] (*Id.*).
[11] (RE#41, RE#41-3; PAGEID#1468, 1492-1496).
[12] (*Id.*).
[13] (*Id.*).

seeking to participate in the KET debates.[14]  The use of "we" was used in that

email as well, raising the inferences that Goodman was involved.[15]  The criteria

were not substantially changed from before.[16]  KET never publicized these new

criteria.[17]

Then, on March 13, 2014, Warren Taylor, press secretary for Plaintiff David

Patterson, the Libertarian Candidate ("Patterson"), sent a press release to various

media outlets, including KET, announcing Patterson's candidacy.[18]  Thus, as of

March 13, 2014, KET and its staff were fully aware of Patterson's candidacy.[19]

The March 5, 2014, "finalized criteria" were the only criteria in effect when KET

received notice of Patterson's candidacy.[20]

On April 18, 2014, Goodman sent an intra-office email expressing his

incredulity over U.S. Senate candidate Shawna Sterling's character and

viewpoints.[21]

Following the results of the primary elections, which nominated current U.S.

Senator Mitch McConnell as the nominee for the Republican Party, and Alison

Lundergan Grimes as the nominee for the Democratic Party, Hopkins sent an email

---

[14]  (RE#41, RE#41-4, PAGEID#1468-1469, 1497-1498).

[15]  (*Id.*).

[16]  (*Id.*).

[17]  (RE#41, ¶74, PAGEID#1483-1484).

[18]  (RE#41, ¶17, RE#41-5, PAGEID#1469, 1499).

[19]  (*Id.*).

[20]  (*Id.*).

[21]  (RE#41, ¶19, RE#41-7, PAGEID#1469, 1503).

to Brower on May 21, 2014, noting that a meeting should be held "to determine what KET wants to do [in response to the primary results] and the best way to approach both campaigns ASAP...."[22]  Brower responded, asking others within KET, including Goodman, to get together to discuss "the McConnell Grimes coverage." *Id.*  No mention was made of any third-party candidates for the simple reason that Defendants had made the decision by that point to exclude these candidates based on their viewpoints. *Id.*

Later that day, on May 21, 2014, Timothy Bischoff sent an email to Senator McConnell and Secretary Grimes to participate in KET's programming and debates.[23]  Once again, Defendants failed to mention or create any contingency plans for inclusion of third party candidates, because Defendants had already made the decision to exclude them based on their party affiliations and viewpoints.[24]

The following morning, KET Executive Director Hopkins drafted an email to Timothy Bischoff and Julie Schmidt containing edits to the proposed invitation, but again, only inviting Senator McConnell and Secretary Grimes.[25]  No mention or contingency planning was made for third party candidates because the decision had already been made to exclude them based on their viewpoints.[26]

---

[22]  (RE#41, ¶21, RE#41-9, PAGEID#1469-1470, 1506-1507).
[23]  (RE#41, ¶22, RE#41-10, PAGEID#1470, 1508).
[24]  (*Id.*).
[25]  (RE#41, ¶23, RE#41-11, PAGEID#1470, 1509-1512).
[26]  (*Id.*).

On May 22, 2014, Hopkins sent formal letters to Senator Mitch McConnell and Secretary Alison Grimes to participate in joint appearances and debates.[27]  No third-party candidate, including Patterson, received such a letter even though the criteria, circulated on March 21, 2014, had not changed as of that point in time.[28]  Significantly, KET never bothered to determine whether either candidate it had invited met any of the required criteria.[29]

In an effort to justify their actions in sending the viewpoint-based, discriminatory May 22, 2014, invitations to only Senator McConnell and Secretary Grimes, as well as their previous invitations to only Senator McConnell and Secretary Grimes, Brower sent two separate emails on May 22, 2014, the first at 11:21 a.m. and the second at 11:27 a.m.[30]  They are addressed to Goodman and others.  *Id.*  Again, the inference is they were all involved.  The first email changed the criteria for inviting additional candidates by raising the contribution requirement and polling requirement and requiring that all four criteria be met: (a) a public position statement on issues; (b) an active campaign website; (c) $100,000 in contributions; and (d) polling at 15% (or 25%).[31]

---

[27]  (RE#41, ¶24, RE#41-12, PAGEID#1470-1471, 1513-1515).
[28]  (*Id.*).
[29]  (*Id.*).
[30]  (RE#41, ¶26; RE#41-14; PAGEID#1471, 1518-1521).
[31]  (*Id.*).

8

In follow up to Brower's email, Executive Director Hopkins, who appears to have been out of the loop on the new criteria, sent an email to Brower on May 22, 2014, asking whether the criteria had changed from the primary.[32]  Brower responded that "[t]his is the criteria for just the US Senate general election."[33]  Again, it is sent to Goodman, suggesting his involvement.[34]

Later that day at 4:45 p.m., Brower sent yet another email to Hopkins regarding KET's intent in changing the criteria.[35]  Brower acknowledged, in relevant part, "I talked it over with Deidre who was most concerned that ***we get this on record today since this will eliminate the write in and other candidate from the forum***.  ***It was agreed by the group yesterday that we should do that.***"[36]  "We" and the "group" included Goodman.[37]  The only "other candidate" who would be excluded by these new criteria was Patterson.[38]  This email clearly evidences a viewpoint-based, discriminatory intent on the part of Defendants in changing the criteria to eliminate particular candidates and their views.

On June 5, 2014, Bischoff sent an email to a group including Goodman regarding "Patterson and Marksbury" and noted, "[p]lease confirm … **we** did not

---

[32]  (RE#41, ¶27; RE#41-15, PAGEID#1471, 1522-1524).
[33]  (*Id.*).
[34]  (*Id.*).
[35]  (RE#41, ¶28; RE#41-16; 1471-1472, 1525-1526).
[36]  (*Id.*) (emphasis added).
[37]  (*Id.*).
[38]  (*Id.*).

___and will not___ invite David Patterson (Lib) and Ed Marksbury (Ind) to the October 13 program, ___because they did not meet our pre-established criteria.___"[39]  This email demonstrates a clear intent to eliminate both candidates from the debate, regardless of whether or not they meet the existing criteria, and confirms that KET would simply change the criteria (as they did in May) to ensure these candidates are excluded based on their viewpoint.  It likewise raises unmistakable inferences about who was involved, including Goodman.

Later that day, Brower responded via email, that Bischoff was "correct."[40]  Again, Goodman is copied, raising an inference of his awareness and participation.

Following this, on June 10 and June 11, 2014, KET staff, including Goodman, engaged in a chain of emails that discussed write-in candidate Robert Edward Ransdell and his viewpoints.[41]  This email likewise raises another inference that the criteria were adopted to exclude particular candidates and viewpoints.  And, this email chain includes Goodman, raising an inference of his personal participation and involvement.

Significantly, it was not until mid-June 2014, that Deidre Clark, another KET employee, was asked to research past election results for the purposes of

---

[39]  (*Id.*, RE#41, ¶29; RE#41-17, PAGEID#1472, 1527 (emphasis added)).
[40]  (RE#41, ¶30; RE#41-18, PAGEID#1472, 1528).
[41]  (RE#41, ¶31; RE#41-19, PAGEID#1472-1473, 1529).

further revising the criteria.[42]  She drafted an email to Brower containing her results, which demonstrated that Democrat and Republican candidates in statewide races had over 10% returns at the polls, while third parties did not.[43]  After she sent this email to Brower, he responded that 10% was "an appropriate criterion."[44]  This demonstrates that the criteria themselves were established to exclude particular parties, and their viewpoints, from the debate.

Defendants again revised the criteria.  On June 16, 2014, Defendants purported to use these new criteria as the "final" criteria for the October 13, 2014, debate[45] -- long after Senator McConnell and Secretary Grimes were invited to participate in the debate, long after Secretary Grimes had accepted the invitation, and long after the May 22, 2014, decision to eliminate specific candidates based on their viewpoints.  On July 16, 2014, Clark sent an email to Brower with attached criteria, requiring: (a) that the candidate is a "Kentucky resident and 'legally qualified candidate' under FCC guidelines;" (b) the candidate has an "active website" that addresses at least three (3) issues related to the race; (c) the candidate has accepted $100,000 in contributions; and (d) the candidate was polling at 10% or more in an independent poll.[46]

---

[42] (RE#41, ¶32, PAGEID#1473).
[43] (*Id.*).
[44] (*Id.*).
[45] (RE#41, ¶33; RE#41-20, PAGEID#1473, 1530-1531).
[46] (*Id.*).

11

Although the deadline for a candidate to meet these criteria was set for August 15, 2014, KET did not issue or share the criteria with the media or the public (even on its website), issue the criteria in a press release, or even provide the criteria by mail to any declared candidates at this time.[47]  The decision not to share its criteria publicly is evidence of viewpoint discrimination.  If the intent is to even-handedly apply pre-established criteria, such criteria would be shared with the candidates and the public alike at the time of their adoption.  It can be inferred that not sharing the criteria publicly would ensure the exclusion of candidates whose viewpoints or parties Defendants do not agree with, by not informing them of the criteria to preclude any opportunity to possibly meet the criteria.

Sometime in mid-August 2014, after the non-published deadline had passed, Patterson, LPKY, and LNC first learned of the criteria and their operation to potentially exclude Patterson from the debate.[48]  In October 2014, Defendants formally excluded Patterson from the debate.[49]

The $100,000 criteria is itself viewpoint discrimination – demonstrating a bias and slant in favor of only those candidates who can self-finance, and excluding those candidates who, out of principle, refuse to raise such an amount

---

[47] (*Id.*).
[48] (RE#41, ¶34, PAGEID#1474).
[49] (*Id.* at ¶35).

(or refuse to take money from Political Action Committees, Unions, or similar organizations).[50]

Furthermore, setting criteria for third party candidates, on July 16, 2014, with a deadline of August 15, 2014, to meet these criteria, has the effect of practically prohibiting any such third-party candidate from reasonably qualifying, given timing issues between ballot qualification and the deadline to meet the criteria.[51]  Thus, the practical effect of these criteria, with the deadline, will always exclude third party candidates, such as Patterson, who must gather the 5,000 signatures to secure ballot access.[52]  Such was the case in the present situation.[53] Defendants, including Goodman, knew as much, and designed the deadline and criteria to exclude these candidates.[54]

On July 28, 2014, Defendants internally circulated an email referring to Patterson and his success in achieving ballot access via a significant number of signatures.[55]  Further emails were sent by and between the campaigns by Senator McConnell and/or Secretary Grimes with KET personnel, which indicate coordination with these campaigns in the exclusion of third party candidates.[56]  On

---

[50] (*Id.* at ¶36).

[51] (*Id.* at ¶37).

[52] (*Id.*).

[53] (*Id.*).

[54] (*Id.*).

[55] (*Id.* at ¶38; RE#41-21, PAGEID#1474, 1532-1534).

[56] (*Id.* RE#41, ¶39).

and prior to August 15, 2014, Mr. Patterson had various polling results above a 5%
threshold, including polling at 7%, and later had polling that revealed 8-9%, and in
any event, each event was well within the margin of error for the 10% polling
criteria on each poll.[57]

Defendants changed the March candidate forum criteria several times from
May through August 2014 for the express and admitted purpose of excluding Mr.
Patterson, and his viewpoints, from the debates.

Defendants engaged in viewpoint discrimination, imposed unreasonable
restrictions on Mr. Patterson's participation in the October 13, 2014 U.S. Senate
debate, and coordinated with one or more opposing candidates' campaigns in a
"manipulation" of the political process and/or modified previous criteria due to
"political pressure inside or outside" KET, all in violation of Plaintiffs' clearly
established First Amendment rights.  Defendants adopted various changes to its
policies for pre-textual reasons, with the actual reason being the exclusion of
Patterson, and his viewpoints, from the debate.[58]

The criteria adopted by the Defendants were not adopted for viewpoint
neutral reasons, but, instead, given the facts and circumstances, were merely pre-

---

[57] (*Id.* at ¶41, PAGEID#1475).
[58] (RE#41, ¶54, PAGEID#1478).

14

textual to exclude all third-party candidates, which is itself viewpoint discrimination.[59]

## II.    Evidence established of record for the Summary Judgment Proceedings

From at least 2000 through 2010, the sole criteria for inclusion in KET's debates or forums, was ballot access.[60]  In January 2010, Hopkins, Brower, Clark, and Goodman received advice about formulating criteria for candidate debates from attorney Todd Gray.[61]  That advice, incidentally, included a sample set of candidate criteria, and included 5% polling criteria.[62]

Defendants could not explain why they did not implement criteria in 2010, following their receipt of Gray's advice.[63]  In 2012, after experiencing two candidates for Congress who ran on single issue anti-abortion campaigns whose message Defendants did not want to air, Brower, Goodman, and Clark imposed an additional unwritten requirement: a Kentucky address to exclude those anti-abortion candidates from KET programming.[64]

---

[59]  (*Id.*, ¶55).
[60]  (Depo. Clark, RE#77, PAGEID#3408).
[61]  (Depo. Hopkins, 3629, Ex. 11, RE#75-11 at PAGEID#2653-2657).
[62]  (*Id.*).
[63]  (Depo. Hopkins, RE#80, PAGEID#3631; Depo. Brower, RE#76, PAGEID#3294-3295).
[64]  (Depo. Brower, RE#76, PAGEID#3285; Depo. Goodman, RE#75, PAGEID#2527-2528, 2544; Depo. Clark, RE#77 at PAGEID#3408; Ex. 30, RE#75-30 at PAGEID#2695-2696).

Following the 2012 anti-abortion candidates, in 2014, Defendants began the process of implementing more stringent candidate criteria.  Hopkins authorized Brower, Goodman, and Clark to develop and implement candidate criteria, while she retained the ability to override decisions that were made.[65]  The basis for pursuit of new criteria in 2014 is best explained by Brower in his January 31, 2014, email: in 2012, they had single issue anti-abortion candidates, and were worried about them showing up later in the election year, and they had at least one "eccentric" candidate in 2014 whose views they did not want to air.[66]  Depending on whom we asked, that "eccentric" candidate who KET desired to exclude by implementing criteria was either Shawna Sterling,[67] or Burl Farnsley.[68]  And the term "eccentric" itself, in at least one definition, refers to a candidate having unusual viewpoints.[69]  Defendants Brower, Clark, Bischoff, and Goodman stated as much to their attorney, Todd Gray on January 31, 2014, in an email.[70]

---

[65] (Depo. Hopkins, RE#80, PAGEID#3627, 3629; Depo. Clark, RE#77, PAGEID#3424, 3428-3429; Depo. Goodman, RE#75, PAGEID#2524; Depo. Brower, RE#76, PAGEID#3281-3282)

[66] (Depo. Brower, RE#76, PAGEID#3285, 3304; Depo. Goodman, RE#75, PAGEID#2527-2528,2544; Depo. Clark, RE#77 at 3408,3429; Ex. 30, RE#75-30, PAGEID#2695-2696).

[67] (Depo. Goodman, RE#75, PAGEID#2545).

[68] (Depo. Clark, RE#77, PAGEID#3429; Depo. Brower, RE#76, PAGEID#3304).

[69] https://en.oxforddictionaries.com/definition/eccentric (last visited 11/7/2016) ("A person of unconventional and slightly strange views…")

[70] (Depo. Brower, RE#76, PAGEID#3285; Depo. Goodman, RE#75, PAGEID#2527-2528,2544; Depo. Clark, RE#77, PAGEID#3408; Ex. 30, RE#75-30, PAGEID#2695-2696).  The email was drafted by Brower, but neither

Todd Gray responded back that same day, instructing Brower, Clark, Bischoff, Goodman and others that the First Amendment applied, that KET had to protect itself from First Amendment lawsuits, and that KET had to make decisions about who to invite or exclude based on grounds that did not include the candidates message or views.[71]  Mr. Gray likewise provided example criteria to that email, suggesting that the candidate meet three out of four criteria, including a 5% polling requirement and $10,000 in contributions.[72]

Following that advice, Brower circulated an email on February 3, 2014, with criteria attached.[73]  Ms. Clark would implement the policy by sending the invitations.[74]  Those February 3, 2014, criteria (the "2/3/14 Criteria") required that a candidate be legally qualified, and then meet one of four other criteria.[75]

The following day – February 4, 2014, Ms. Clark implemented the 2/3/14 Criteria by sending out a series of invitations to candidates for the United States Senate in Kentucky – including to incumbent U.S. Senator Mitch McConnell and

---

Goodman, Clark, nor Bischoff corrected his statement at the time.  (Depo. Bischoff, RE#79, PAGEID#3550-3551).

[71]  (Depo. Brower, RE#76, PAGEID#3305-3306; Depo. Goodman, RE#75, PAGEID#2543-2544; Depo. Clark, RE#77, PAGEID#3432-3434; Ex.31, RE#75-31, PAGEID#2697-2699).

[72]  (*Id.*).

[73]  (Depo. Brower, RE#76, PAGEID#3308; Depo. Clark, RE#77, PAGEID#3430-3432; Depo. Goodman, RE#75, PAGEID#2548-2549).

[74]  (Depo. Brower, RE#76, PAGEID#3308-3309; Depo. Clark, RE#77, PAGEID#3413).

[75]  (*Id.;* Ex. 33, RE#75-33, PAGEID#2703-2704).

Kentucky Secretary of State Allison Grimes.[76]  The invitation was a "conditional invitation" to the October 13, 2014, U.S. Senate program as well – conditional on the candidate winning his or her primary, and specifically utilizing the term "and we're inviting U.S. Senate general election candidates to be guests on the October 13 program."[77]

Brower was concerned that Burl Farnsley – who Brower testified was "eccentric" and had eccentric viewpoints,[78] might meet the 2/3/14 Criteria, and was aware that Farnsley did not have a website.[79]  To help ensure Farnsley did not qualify, Brower modified the criteria on February 5, 2014, replacing a press coverage requirement on the 2/3/14 Criteria, with a requirement that the candidate have an active website (the "2/5/14 Criteria").[80]  He shared these criteria with Goodman and Clark, neither of whom objected or disagreed.[81]  In the end, Brower's changing of the criteria plan succeeded – Brower, Clark, and Goodman

---

[76]  (Depo. Clark, RE#77, PAGEID#3433).
[77]  (Depo. Clark, RE#77, PAGEID#3435, Depo. Clark Vol.II, RE#78, PAGEID#3526; Depo. Brower, RE#76, PAGEID#3312).
[78]  (Depo. Brower, RE#76, PAGEID#3304).
[79]  (Depo. Brower, RE#76, PAGEID#3299, Ex.19, RE#75-19, PAGEID#2676).
[80]  (Depo. Brower, RE#76, PAGEID#3313, Ex.35, RE#75-35,PAGEID#2712-2713; Depo. Clark, RE#77,PAGEID#3435-3436; Depo. Goodman, RE#75, PAGEID#2550-2551).
[81]  (*Id.*).

18

discussed Farnsley, confirmed his lack of website, and excluded him from the Democrat U.S. Senate primary program.[82]

Both the 2/3/14 Criteria and the 2/5/14 Criteria were captioned "Candidate Invitation Criteria," applied to the "2014 Primary and General Elections," and noted that "[a] candidate will be invited" provided the "candidate can demonstrate that he/she satisfies" the criteria.[83]  Neither had deadlines, and thus only had to be met as of the date of the program itself.[84]  Patterson would have met either of these criteria if they were applied to him in August 2014.[85]

On March 5, 2014, Hopkins asked Brower for the criteria.[86]  He supplied the 2/5/14 Criteria, and – in an apparent reference to the prior out of state candidates expressing an anti-abortion viewpoint that Defendants had excluded in 2012 without issue, expressly told her that they excluded such out-of-state candidates.[87]

---

[82]  (Depo. Brower, RE#76, PAGEID#3319-3321; Depo. Clark, RE#77, PAGEID#3430,3448-3449; Depo. Goodman, RE#75, PAGEID#2554, 2563; Exhibits 39, 58, RE#75-39,75-59, PAGEID#2728,2762-2763).

[83]  (Depo. Brower, RE#76, PAGEID#3308-3309; Depo. Clark, RE#77, PAGEID#3413).

[84]  (Depo. Clark, RE#77, PAGEID#3432).

[85]  (Depo. Clark, RE#77, PAGEID#3443-3444).

[86]  (Depo. Brower, RE#76, PAGEID#3314, Ex.40, RE#75-40, PAGEID2729-2730; Depo. Hopkins, RE#80, PAGEID#3632-3633, Ex. 40, RE#75-40, PAGEID#2729-2730).

[87]  (*Id.*).

19

Not later than March 13, 2014, Patterson's campaign, through its press secretary, reached out to KET, specifically Clark, in an email containing two press releases, and in order to "establish contact."[88]

Meanwhile, Shawna Sterling was also a concern in the primary cycle.[89] On April 17, 2014, Ms. Sterling accepted the invitation she was extended – and apparently expecting to lose the primary, indicated she was also accepting the invitation for the October 13, 2014 program for the general election, since she was going to file as a write-in.[90]

Goodman, Clark, and Brower made their disdain clear for her and her viewpoints in a series of emails on April 18, 2014, going so far as to suggest that law enforcement be on hand (in a joking manner) to deal with her.[91]

### III    The period after the May 2014 primary

All of the Defendants were well aware that on May 20, 2014, Senator McConnell and Secretary Grimes had won their respective primary races.[92] The

---

[88]  (Depo. Clark, RE#77,PAGEID#3439-3440, Ex.42, RE#75-42, PAGEID#2734).

[89]  (Depo. Brower, RE#76, PAGEID#3319-3321; Depo. Clark, RE#77, PAGEID#3447-3448; Depo. Goodman, RE#75, PAGEID#2559; Ex.56, RE#75-56,PAGEID#2760).

[90]  (Depo. Clark, RE#77, PAGEID#3446-3447; Depo. Brower, RE#76, PAGEID#3317-3318; Depo. Goodman, RE#75, PAGEID#2560, Ex.55, RE#75-55, PAGEID#2752-2759)

[91]  (Depo. Brower, RE#76, PAGEID#3319-3321; Depo. Clark, RE#77, PAGEID#3447-3448; Depo. Goodman, RE#75, PAGEID#2559; Ex.56, RE#75-56, PAGEID#2760).

following day, on May 21, 2014, at 4:15 p.m., Hopkins convened an emergency

meeting to respond to invitations extended by WDRB – a television station in

Louisville – to Senator McConnell and Secretary Grimes for debates.[93]  The

centerpiece of the discussion, attended by Hopkins, Brower, Bischoff, Clark and

Goodman and others, was on Senator McConnell and Secretary Grimes – no other

candidates were discussed.[94]  The criteria were not discussed or even mentioned in

this emergency summit.[95]

The coverage and debate was a "big deal" to KET and specifically Brower

and Hopkins.[96]

Following that meeting, Bischoff and Hopkins drafted and sent letters to

Senator McConnell and Secretary Grimes.[97]  Those letters do not use the term

"invitation," refer to themselves as letters, mention "multiple joint appearances,"

---

[92]  (Depo. Clark, RE#77, PAGEID#3449-3450; Depo. Goodman, RE#75,
PAGEID#2564; Depo. Brower, RE#76, PAGEID#3323; Depo. Bischoff, RE#79,
PAGEID#3555-3556; Depo. Hopkins, RE#80, PAGEID#3633).
[93]  (Depo. Hopkins, RE#80, PAGEID#3633-3655; Ex.64, RE#75-64,
PAGEID#3450-3452; Depo. Bischoff, RE#79, PAGEID#3556-3557; Depo.
Brower, RE#76, PAGEID#3324; Depo. Clark, RE#77, PAGEID#3450-3452;
Depo. Goodman, RE#75, PAGEID#2564-2565).
[94]  (*Id.*).
[95]  (*Id.*).
[96]  (Depo. Hopkins, RE#80, PAGEID#3638; Depo. Brower, RE#76,
PAGEID#3327).
[97]  (Depo. Hopkins, RE#80, PAGEID#3635; Exs. 65,66,69,70,71,72,73, RE#75-
65,75-66,75-69,75-70,75-71,75-72,75-73, PAGEID#2776-2778, 2782-2796; Depo.
Bischoff, RE#79, PAGEID3557-3561).

and do not reference the October 13, 2014, Senate debate/forum.[98]  Indeed, these

were not viewed as invitations to that program until the lawyers got involved.[99]

This, of course, matches the practice of KET to extend invitations in writing to be

clear about the date of the program and other details of the program.[100]  By her own

admission, Hopkins' testified that the criteria were not considered, mentioned,

utilized, or discussed in sending these letters.[101]   A minute later, Bischoff sent

copies of the letters to Brower, Goodman, Clark, and Hopkins.[102]

Clark participated actively in the formulation of the criteria and was aware,

prior to May 22, 2014, of Patterson.[103]  She was also aware that Patterson had been

included in a *Bluegrass Poll* prior to May 22, 2014, where KET had aired the

results.[104]  Indeed, that poll demonstrated Patterson at 4% in a hypothetical four-

way race.[105]

---

[98]  (*Id.*).
[99]  (Depo. Brower, RE#76, PAGEID#3335).
[100]   (Depo. Clark, RE#77, PAGEID#3421-3422).
[101]  (Depo. Hopkins, RE#80, PAGEID#3636).
[102]  (Depo. Bischoff, RE#79, PAGEID#3561, Ex.76, RE#75-76,PAGEID#2802)
[103]  (Depo. Clark, RE#77, PAGEID#3460-3461).
[104]  *Id.*
[105]  http://www.kentucky.com/news/politics-government/article44489367.html (last
visited 11/7/2016), attached to the declaration of Mr. Moellman.  The poll is
contained at http://www.kentucky.com/latest-
news/article43391895.ece/BINARY/See%20detailed%20poll%20results,%20inclu
ding%20approval%20ratings,%20for%20Bevin,%20McConnell%20and%20Grime
s (last visited 11/7/2016).  RE#87-2, PAGEID#4059-4082.

Several minutes after the letters were released, Brower panicked and realized that KET had sent out public letters imploring Senator McConnell and Secretary Grimes to appear on KET, without addressing the criteria. So, at 10:58 a.m., he began rushed work on revising the criteria.[106] By 11:21 a.m. on May 22, 2014, Brower had completed his change to the candidate invitation criteria, reflected and attached to an email he circulated to Bischoff, Clark, Goodman, and Hopkins, among others.[107]

The reason Defendants gave for the change was that the criteria in place for the primary was insufficient – it did not screen out Shawna Sterling.[108] But it is not clear that Ms. Sterling, or the other eventual write-in candidate, Mr. Ransdell, would have met the 2/5/14 Criteria, or even the 2/3/14 Criteria, due to lack of a staffed campaign headquarters.[109]

Brower was in such a rush to change the criteria that a mere six minutes later, at 11:27 a.m., he again revised the criteria, correcting a typographical error on the polling criteria, and found in Exhibit 79 (the "5/22/14 Criteria").[110] Those criteria were significantly more stringent, requiring $100,000 fundraising, 15%

---

[106] (Depo. Bischoff, RE#79, PAGEID#3546, Ex.202, RE#75-202, PAGEID#3228).
[107] (Depo. Clark, RE#77,PAGEID#3454-3455; Ex.78, RE#75-78, PAGEID#2805-2806; Depo. Brower, RE#76 at 203-208; Depo. Goodman, RE#75,PAGEID#2567-2570).
[108] (Depo. Brower, RE#76, PAGEID#3329).
[109] (Depo. Clark, Vol.2, RE#78,PAGEID#3512-3513).
[110] (Depo. Brower, RE#76, PAGEID#3331, Ex.79, RE#75-79, PAGEID#2807-2808).

23

polling, and various other requirements, all of which had to be met.[111]  They were also drafted without consultation with Mr. Gray, although they were inconsistent with Mr. Gray's prior advice of 5% polling and $10,000 fundraising.

That same day in a series of emails, Brower was questioned by Hopkins about the change, who was not aware that the criteria would be changing, yet again.[112]  Mr. Brower's explanation to Ms. Hopkins was that he:

> talked it over with Deidre who was most concerned that **we get this on record today since this will eliminate the write in and other candidate from the forum**.  **It was agreed by the group yesterday that we should do that**.  Tim and Julie both responded with minor corrections and expressed no problems with the overall idea.[113]

As noted, Clark, and the rest of the group were well aware, in setting the criteria, that both Senator McConnell and Secretary Grimes would meet the revised criteria.[114]  She was aware of Patterson's polling at 4%.[115]  Clark, Brower, and Goodman chose a 15% threshold, well above what any third-party candidate in any statewide race had ever polled in the history of Kentucky.[116]

---

[111]  (*Id.*).

[112]  (Depo. Hopkins, RE#80, PAGEID#3638-3640; Ex.88,RE#75-78,PAGEID#2821-2822).

[113]  (*Id.*; Depo. Brower, RE#76, PAGEID#3332-3334) (emphasis added).

[114]  (Depo. Clark, RE#77,PAGEID#3458).

[115]  (*Id.* PAGEID#3460-3461).

[116]  (Depo. Clark, Vol. 2, RE#78,PAGEID#3514-3515).

The "group" referenced in Brower's email consisted of Goodman, Clark, Brower, and Bischoff.[117] The group agreed to eliminate those candidates from the program.[118] Brower knew that the write-in candidate was Ms. Sterling, but told Plaintiffs to ask Clark who the other candidate was.[119] Clark said the other candidate could have pertained to either Patterson or Marksbury (or both), since she was aware of both.[120] In response to receiving the news of this targeting of Patterson, Hopkins did nothing.[121]

On June 5, 2014, Secretary Grimes accepted the invitation to the October 13, 2014, debate.[122] Bischoff and Hopkins worked on a press release starting on June 4 and 5, 2014.[123] Those drafts included input from Brower and Goodman, and Clark was included in the communication chain.[124] The release, among other things, correctly stated that "[i]n early February, KET invited Senator McConnell and Secretary Grimes to appear on *Kentucky Tonight* during their respective

---

[117] (Depo. Brower, RE#76, PAGEID#3332-3334; Ex.88,RE#75-78,PAGEID#2821-2822; Depo. Clark, RE#77,PAGEID#3462; Depo. Goodman, RE#75, PAGEID#2573-2574).

[118] (Depo. Goodman, RE#75, PAGEID#2573-2574).

[119] (Depo. Brower, RE#76, PAGEID#3332-3334).

[120] (Depo. Clark, RE#77,PAGEID#3461-3462).

[121] (Depo. Hopkins, RE#80, PAGEID#3639-3640).

[122] (Depo. Clark, RE#77,PAGEID#3464, Ex.98, RE#75-98,PAGEID#2838).

[123] (Depo. Bischoff, RE#79, PAGEID#3565-3571, Exs. 93,94,95,96,97,104,106,107,108,109,110,111,112, RE#75-93,75-94,75-95,75-96,75-97,75-104,75-106,75-107,75-108,75-109,75-110,75-111,75-112, PAGEID#2831-2837,2851,2853-2860).

[124] (*Id.*)

primary races in April and during the general election campaign on October 13, 2014, should they win their primaries."[125]

Significantly, on June 5, 2014, and in response to the earlier press release, Bischoff received a press inquiry concerning Patterson participating in KET debates from a TV reporter in Louisville.[126]  Specifically, Bischoff was asked whether KET did, or would, invite Patterson to debate.[127]  Bischoff then sent an email to Clark, Brower, and Goodman on June 5, 2014.[128]

That email states: "Please confirm …. We did not **and will not** invite David Patterson (Lib) and Ed Marksbury (Ind) to the October 13 program, because they did not meet our pre-established criteria."[129]  Several inferences must be drawn from that email.  First, "will not" involves a future intention that, regardless of what happens, Mr. Patterson will not be invited.  Second, Bischoff was well aware of Patterson and his status as the Libertarian candidate.  Bischoff admitted that he probably googled Patterson or had seen him mentioned prior to sending the email.[130]

---

[125]  (*Id.*, Ex.112, RE#75-112,PAGEID#2860).
[126]  (Depo. Bischoff, RE#79, PAGEID#3572).
[127]  (*Id.*).
[128]  (Depo. Bischoff, RE#79, PAGEID#3572-3573, Ex.114,RE#75-114, PAGEID#2862).
[129]  (*Id.* (emphasis added)).
[130]  (Depo. Bischoff, RE#79, PAGEID#3572).

Brower responded a few minutes later stating: "[t]hat's correct Tim."[131]
Goodman followed up a few minutes later, at 4:47 p.m., on June 5, 2014, noting
that "[w]e didn't include them in the invitation for the October program; it leaves
open including other candidates on the ballot to appear in a separate program
…"[132] Goodman was clear in his testimony that candidates other than Senator
McConnell and Secretary Grimes, including Mr. Patterson, <u>even if they met the
criteria</u>, would only be included on a **<u>separate program</u>**.[133]

Testimony indicated there was no deadline to meet the 5/22/14 Criteria and,
therefore, the deadline was the date of the program itself.[134]

On June 11, 2014, Defendants had a discussion about write-in candidate,
Robert Ransdell, in which he was called "a nut" and the criteria were mentioned as
the way to eliminate him.[135] This followed emails by Bischoff and Brower
regarding the candidate.[136]

---

[131] (Depo. Bischoff, RE#79, PAGEID#3573-3574; Ex.115, RE#75-15,
PAGEID#2863-2864; Depo. Brower, RE#76, PAGEID#3338-3340at 244-252).
[132] (Depo. Goodman, RE#75, PAGEID#2580-2582, Ex.116, RE#75-116,
PAGEID#2865).
[133] (Depo. Goodman, RE#75, PAGEID#2580).
[134] (Depo. Clark, RE#77, PAGEID#3459).
[135] (RE#27, 30(B)(6) testimony of Bill Goodman, PAGEID#827-832, Ex. 36,
RE#27-1, PAGEID#996-998).
[136] (*Id.*).

After these machinations, Brower circled back with Todd Gray on June 11, 2014, with whom no one at KET had any contact since January 31, 2014.[137]  No one at KET ever informed Mr. Gray that the ship had sailed and the invitations had already been sent.[138]  In fact, the interactions with Mr. Gray can aptly be described as very limited.  He spent a total 1.4 total hours in January 2014, working on criteria-related issues with KET, and a total of 3.2 hours total in June 2014, working on criteria-related issues with KET.[139]

On June 11, 2014, Brower reached out to Mr. Gray in a series of emails, but failed to inform him that invitations had already been sent and one was accepted.[140]  A call then occurred on June 16, 2014, between Mr. Gray and Brower, Clark, and Bischoff, around 11:00 a.m.[141]  Brower took notes of the call.[142]  These notes reflect advice from Mr. Gray to KET on the criteria to be used that included a polling range between 5% and 10%.  Apparently Brower, Clark and others on the

---

[137]  (Depo. Brower, RE#76 PAGEID#3341-3344; Depo. Gray, RE#81, PAGEID#3676,3682-3683,3695-3696, Exs. 200, 201, RE#75-200,75-201, PAGEID#3225-3227).

[138]  (Depo. Brower, RE#76, PAGEID#3342-3344; Depo. Gray, RE#81, PAGEID#3692).

[139]  (Depo. Gray, RE#81, PAGEID#3676,3682-3683,3695-3696; Exs. 200, 201, RE#75-200,75-201, PAGEID#3225-3227).

[140]  (Depo. Brower, RE#76, PAGEID#3341-3344, Exs. 123-124, RE#75-123,75-124,PAGEID#2873-2875)

[141]  (Depo. Brower, RE#76, PAGEID#3344; Ex.129, RE#75-129,PAGEID#2889).

[142]  (Depo. Brower, RE#76, PAGEID#3345-3346; Ex.131, RE#75-131, PAGEID#2891-2894).

call suggested 10%.[143]  Mr. Gray then suggested a deadline, provided it was "not

arbitrary, as if it were in place to eliminate a specific candidate."[144]  The notes

reflect discussion about the filing deadline and *Visions* magazine to be the basis for

an August 15, 2014, deadline; but Mr. Gray was not sure that was discussed, or

was something Brower came up with later.[145]  And, only being half informed, Mr.

Gray suggested that KET could revise its criteria.[146]  Again, Mr. Gray was not

informed that invitations had already been sent.

KET did not immediately reduce its polling criteria to 10%.  Instead, a few

hours later, on June 16, 2014, Clark performed follow up research on past electoral

results involving third party candidates in Kentucky.[147]  A reasonable inference

from these facts is that only after confirming that it was extraordinarily unlikely

that Patterson would meet the 10% criteria, did Brower agree to lower the criteria

to 10%.[148]  As we know, Clark was aware of Patterson's 4% *Bluegrass Poll* in

May, and a 5% criterion was likely just too close for comfort.[149]

---

[143]  (*Id.*).

[144]  (*Id.*).

[145]  (Depo. Gray, RE#81, PAGEID#3701).

[146]  (*Id.*).

[147]  (Depo. Brower, RE#76, PAGEID#3344-3347; Ex.130,132, RE#75-130,75-132, PAGEID#2890,2895; Depo. Clark, RE#77, PAGEID#3468-3470; Depo. Clark Vol. 2, RE#78, PAGEID#3515-3519).

[148]  (*Id.*).

[149]  (Depo. Clark, RE#77, PAGEID#3460-3461).

When asked why, in light of Mr. Gray's advice, KET chose to lower the criteria to 10% instead of 7.5%, or 5%, Clark, Brower, and Goodman were at a loss to provide any rational answer -- or any answer at all.[150]

Brower further revised his notes from the original notes taken following the call, removing the discretion and advice that Mr. Gray gave to set the polling between 5% and 10%, as well as the magazine as the basis for the August 15, 2014, deadline, and then sent the notes out to a wider audience to review, and ultimately for to Mr. Gray to review.[151]  Brower specifically pointed out to others at KET, including his peers, that "Todd said it was legally okay to revise our US Senate criteria."[152]

A reasonable inference to draw from Brower's modifications to his notes is that he did not want anyone else internal at KET to question the decision to change the criteria from 5%, and did not want anyone with knowledge of the magazine's actual deadlines to question the deadline.  Another reasonable inference is that Brower knew that modification of the criteria after the invitations had gone out was a huge issue, failed to inform Mr. Gray of that fact, but wanted to rely on Mr. Gray's advice that was not based on all the facts.

---

[150]  (Depo. Clark Vol.2, RE#78, PAGEID#3515-3516; Depo. Brower, RE#76, PAGEID#3345).
[151]  (Depo. Brower, RE#76, PAGEID#3347-3348; Exs.133,134,RE#75-133,75-134, PAGEID#2896-2904).
[152] *Id.*

In terms of the date with the *Visions* magazine, we learned that its October, 2014 edition was not finalized until September 10, 2014.[153] Further, the September 2014 edition of *Visions* nevertheless included information about September Congressional debate dates, notwithstanding a similar August 15, 2014 deadline.[154] Finally, the content of these editions reveals they contained very little about the forums or even the candidates themselves.[155]

Indeed, when it came to deadlines, Defendants confirmed that deviations between programming that actually occur and that advertised in *Visions* are common.[156] Clark confirmed that candidates have indicated whether or not they would appear up to the date of scheduled programs, sometimes coming in half way through a show.[157] In short, the secret August 15, 2014, deadline date was merely a pretext to ensure Patterson was not included.

KET, and specifically Brower, altered the criteria yet again on June 17, 2014.[158] Then, on July 16, 2014, Defendants finally decided to send the criteria to certain uninvited candidates.[159] On July 23, 2014, Clark sent the candidate

---

[153] (Depo. Bischoff, RE#79, PAGEID#3577-3578).
[154] (*Id.*).
[155] (Depo. Bischoff, RE#79, PAGEID#3590-3592; Exs.197,198,199,RE#75-197,75-198,75-199,PAGEID#3142-3224).
[156] (Depo. Bischoff, RE#79, PAGEID#3578; Depo. Brower, RE#76, PAGEID#3322; Depo. Clark, Vol.2, RE#78, PAGEID#3518-3519).
[157] (Depo. Clark, RE#78, PAGEID#3529).
[158] (Depo. Goodman, Ex.136, RE#75-136, PAGEID#2911-2913).
[159] (Depo. Clark, Vol.2, RE#78, PAGEID#3522).

31

invitation criteria to candidates Sterling and Ransdell.[160]  But, notwithstanding

Clark's testimony that the criteria were only sent to candidates who expressed

interest, Patterson's campaign had issued a press release, which Clark not only

received on July 17, 2014, but forwarded to Goodman, Brower, and others on July

28, 2014, which noted "we're going to be on the ballot," "[w]e've asked to be

included in Fancy Farm and other upcoming events… we're very serious."[161]  That

same press release provided contact information.[162]  Clark likewise forwarded a

copy of Patterson's website to this same group a few minutes earlier.[163]

 In fact, Clark received other press releases from Patterson's campaign, and

Defendants received inquiries about Patterson's participation in other coverage,

which was shared with Goodman, Clark, and Brower.[164]  Clark likewise received

notice of Patterson's filing and qualifying for the ballot on August 11, 2014.[165]

---

[160]  (Depo. Clark, Vol.2, RE#78, PAGEID#3523-3524; Exs.148-149, RE#75-148,75-149, PAGEID#2961-2962).
[161]  (Depo. Clark, Vol.2, RE#78,PAGEID#3525; Ex.151,RE#75-151, PAGEID#2964-2965).
[162]  (*Id.*).
[163]  (Depo. Clark, Vol.2, RE#78, PAGEID#3524;Ex.150, RE#75-150,PAGEID#2963).
[164]  (Depo. Clark, Vol.2, RE#78, PAGEID#3524-3525; Exs.155,156, RE#75-155,75-156,PAGEID#2970-2972).
[165]  (Depo. Clark, Vol.2, RE#78, PAGEID#3526; Ex.158,RE#75-158, PAGEID#2974).

And yet, neither Clark, Brower, Goodman, nor anyone else at KET ever sent the criteria to Patterson.[166]

The reasonable inference to draw from these facts is simple: there was no way that Mr. Ransdell or Ms. Sterling could meet the stringent KET criteria.  But Mr. Patterson, if he were aware of the criteria, *might*.  That was a chance the Defendants could not take and it meant that no one – until after the deadline had passed, was going to share those criteria with Patterson or his campaign in case he might actually meet them.

On August 16, 2014, Clark received an email from Patterson's campaign inquiring about the debate.[167]  On August 18, 2014, Senator McConnell's staff corresponded with Goodman, confirming that "all correspondence" explicitly noted a joint appearance, and that it is "[n]ice to finally have an agreement under our belt."[168]  Only after that agreement, and the fact the deadline had passed, did Clark, on August 18, 2014, at 5:14 p.m., respond to Patterson's campaign and finally inform them of the criteria and the deadline.[169]

---

[166]  (Depo. Clark, Vol.2, RE#78, PAGEID#3522-3526; Depo. Brower, RE#76, PAGEID#3341; Depo. Goodman, RE#75, PAGEID#2593).

[167]  (Depo. Clark, Vol.2, RE#78,PAGEID#3526-3537, Ex.160, RE#75-160, PAGEID#2977).

[168]  (Depo. Goodman, RE#75, PAGEID#2600-2601; Exs.167,170, RE#75-167,75-170, PAGEID#2988-2990,2993-2994)

[169]  (Depo. Clark, Vol.2, RE#78,PAGEID#3527; Ex.162,RE#75-162, PAGEID#2980).

Later that day, KET Board Member Donna Moore Campbell sent an email to Goodman and Hopkins stating, in part: "Wish there was no Libertarian candidate!'[170] Goodman's response was "Thank you."[171] Hopkins, who took the opportunity to sleep on it, responded the following morning, calling Patterson "the Libertarian", and noting that "[i]t will be just McConnell and Grimes, which we believe is the best service for our viewers."[172] Ms. Moore Campbell re-iterated: "[a] much better hour with only the two!  Great!"[173]

The reasonable inference (or the plain reading) of these emails is that: there was an intent to exclude Mr. Patterson and the Libertarians based on their party affiliation and platform, from the beginning, it succeeded, Board Member Campbell, who was Hopkins' supervisor, congratulated Goodman and her on that accomplishment, and Goodman thanked her for congratulating him.

Finally, on October 7, 2014, Goodman corresponded with his friend and colleague Al Cross, noting the pendency of this lawsuit, and the fact that he would

---

[170] (Depo. Goodman, RE#75, PAGEID#2599; Ex.164, RE#75-164,PAGEID#2982; Depo. Hopkins, RE#80, PAGEID#3646-3647).
[171] (Depo. Goodman, RE#75, PAGEID#2601; Ex.171, RE#75-171, PAGEID#2995).
[172] (Depo. Hopkins, RE#80, PAGEID#3646-3647; Ex.174, RE#75-174,PAGEID#3002).
[173] (*Id.*).

be giving testimony in it.[174]  In that email, Goodman noted he had a meeting with

his lawyers later that day, and asks Cross: "should I take the 5th?"[175]

## SUMMARY OF THE ARGUMENT

The District Court erred in granting partial dismissal and summary judgment

to Defendants.  Rather than appropriately applying the standard of review for such

motions, it appears that the District Court, perhaps colored by its preliminary

injunction hearing, turned those standards on their head.   The decisions of the

District Court likewise failed to apply the relevant law, and largely ignored the

viewpoint discrimination evidence presented in this case.

## ARGUMENT

### I.    The District Court erred in granting partial dismissal to Defendants and partial summary judgment as to the criteria themselves

On February 5, 2016, the District Court granted, in part, Defendants' request

for partial dismissal of the individual capacity claims against Goodman.[176]  It

thereafter granted Defendants summary judgment on the claims related to the

criteria themselves regarding: (1) the $100,000 invitation criteria, (2) the August

15, 2014, filing deadline, and (3) Plaintiffs' Equal Protection Claims.[177]

---

[174]  (Decl. Winter, RE#82-2, PAGEID#3887-3889].
[175]  (*Id.*).
[176]  (Order, RE#47, PAGEID#1676-1697).
[177]  (*Id.*).

A.    <u>The financial criteria are impermissible and were appropriately plead</u>

Contribution-based criteria for debates *can be* constitutional, when presented as one of several paths to qualification.  *See Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666 (1998).  In *Forbes*, a political candidate asked to be included on a show run by the Arkansas Education Television Commission ("AETC"), Arkansas' equivalent to KET.  AETC denied the candidate's request to appear, finding that he had failed to garner enough support from the public.  *Id.* at 671.  The Court applied established "forum" precedent, noting that restrictions on speech in such forums must be reasonable and <u>not an effort to suppress expression</u> merely because public officials oppose the speaker's views.  *Id.*  The Court ultimately found in *Forbes* that AETC's decision not to include a candidate in their debates because he had very little public support was reasonable given the circumstances.  *Id.* at 683.

The *Forbes* Court established that: (1) a candidate debate sponsored by public access television was subject to First Amendment scrutiny; (2) a public access broadcaster may discriminate against candidates based on levels of public support as long as the restrictions are reasonable; but (3) even if reasonable restrictions are imposed, a public access broadcaster may not "suppress expression" because the "public officials oppose the speaker's view."  *Id.* at 677.  The *Forbes* Court held that "[a] broadcaster cannot grant or deny access to a

36

candidate debate on the basis of whether it agrees with a candidate's views." *Id.* at 676. Likewise, it is improper to exclude a candidate by "manipulating" the political process or because of "political pressure inside or outside" of the public broadcaster. *Id.* at 681. The rights set forth in *Forbes* were thus clearly established by the time of Defendants' conduct in 2014.

The $100,000 criterion, which had to be met *in addition to* the remaining criteria, was not reasonable. Indeed, *Forbes* involved a situation where there were multiple paths to qualification, none of which that candidate met. Plaintiffs' case is factually inapposite.

In *Forbes*, the Court found no evidence that AETC planned to deny Forbes a spot regardless of whether he met the qualifications. In this case, Defendants made the conscious decision on June 5, 2014, to deny Patterson a spot at the debate regardless of whether he ever met the criteria – however the criteria evolved.

Second, in *Forbes*, the Court concluded that AETC's decision not to include Forbes because of his lack of public support was reasonable and not an effort to suppress expression. *Id.* at 683. Forbes was running as an independent and had gained no support for his candidacy beyond acquiring the 2,000 signatures required for ballot access.[178] In fact, Forbes described his own campaign organization as

---

[178] The testimony in *Forbes* was that the Plaintiff was excluded because: (1) he was not serious; (2) no news organizations considered him serious; (3) his name was not even going to be run in the election results the night of the election; (4) he

"bedlam" and media coverage as "zilch." *Id.* at 682. Plaintiffs, on the other hand, ran a legitimate campaign. Patterson was running as the candidate of the Libertarian Party, the third-largest political party in the United States. Plaintiffs obtained 5,000 signatures between Patterson's party nomination on March 1, 2014, and his placement on the ballot on August 11, 2014. Plaintiffs had a campaign website, were actively fundraising, and polling results supported his legitimacy as a serious candidate. Newspaper and other media covered Patterson's candidacy. Patterson was a legitimate candidate, and preemptively denying him access to a statewide speech forum was not reasonable nor was it viewpoint neutral.

This case is the antithesis of *Forbes*, and the Supreme Court took painstaking care to distinguish the facts in *Forbes* from circumstances like these.

Other cases likewise support the challenge to the $100,000 criteria as it violates clearly established rights. *Davis v. FEC*, 554 U.S. 724 (2008) (improper for government, under First Amendment, to use wealth in connection with election speech as a criteria).

In *Lubin v. Panish*, 415 U.S. 709 (1974), the U.S. Supreme Court found Equal Protection and First Amendment violations by a ballot access provision that required a fee -- a wealth based criteria -- for placement on ballot. The Court noted that "fees, however large, do not, in and of themselves, test the genuineness of a

---

had no financial support; and (5) there was no headquarters other than his house. It was all of these factors, together, that led to his exclusion.

candidacy or the extent of the voter support of an aspirant for public office." Here, of course, the fundraising criteria is the equivalent – a wealthy candidate can self-fund or loan herself the amount required. Indeed, in *Lubin*, the Court noted that "[a] large filing fee … is not a certain test of whether the candidacy is serious or spurious. A wealthy candidate with not the remotest chance of election may secure a place on the ballot by writing a check.… We have also noted that prohibitive filing fees … can effectively exclude serious candidates. Conversely, if the filing fee is more moderate, as here, impecunious but serious candidates may be prevented from running. Even in this day of high-budget political campaigns some candidates have demonstrated that direct contact with thousands of voters by 'walking tours' is a route to success." *Id. See also*, *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 666 (1966) (wealth cannot be the litmus test for exercise of rights).[179]

The District Court erred in upholding KET's $100,000 criteria, which had to be met irrespective of any other showing of support.

B.    The August 15, 2014, deadline is also unconstitutional

The District Court also upheld the August 15, 2014, qualification deadline.

---

[179]  Defendants misleadingly cited to *Arons v. New Jersey Network*, 775 A.2d 778, 784 (NJ Super. 2001) for the proposition that the court determined that the $150,000 criteria in that case was constitutional. But the Court in *Arons* was clear that it was not deciding that issue.

As a practical matter, Patterson could not have raised $100,000 and generated 10% support in the polls until after he filed his ballot access petition on August 11, 2014. Accordingly, Paragraph 37 of the Amended Complaint asserted that the August 15, 2014, deadline "has the effect of practically prohibiting any such third party candidate from reasonably qualifying, since there would be insufficient time to raise funds, and since such candidates are typically not included in media outlets or releases, or in polling, prior to ballot qualification."[180] The Amended Complaint alleges that Defendants knew of and intended this effect in order to exclude Plaintiffs from the debate.[181]

This Court, in *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 593 (6th Cir.2006), made it clear that any burdens associated with deadlines are viewed in relation to the ability to meet those deadlines. Here, it is unlikely any third-party candidate could ever have meet the secret deadline imposed by KET so near in time to the third party candidate qualifying for the general election ballot. And, as *Forbes* makes clear, criteria must be "reasonable." *Forbes,* 523 U.S. at 677-678. The deadline was not reasonable, particularly in conjunction with the remaining criteria. The District Court erred in holding otherwise.

C.     The criteria that were applied together against Plaintiffs to exclude Mr. Patterson, are challenged in conjunction with one another and were appropriately plead

---

[180]  (Amended Complaint, Doc.#41, PAGEID#1474).
[181]  (*Id.*).

Defendants, aware that Plaintiffs lodged claims against the criteria in tandem, engaged in sleight of hand by addressing the criteria as standalone requirements.  *See Storer v. Brown*, 415 U.S. 724, 737 (1974) ("[A] number of facially valid provisions of election laws may operate in tandem to produce impermissible barriers to constitutional rights.").  The appropriate consideration is not merely whether each criteria "individually creates an impermissible burden but rather whether the combined effect of the applicable … regulations creates an unconstitutional burden on First Amendment rights." *Blackwell*, 462 F.3d at 586. The *Blackwell* Court noted that the U.S. Supreme Court "has consistently noted the fundamental interest of citizens to create and develop new political parties." *Id.* "[I]t is especially difficult for the State to justify a restriction that limits political participation by an identifiable political group." *Id.* at 588.  Furthermore, "[a] burden that falls unequally on new or small political parties or on independent candidates impinges, by its very nature, on associational choices protected by the First Amendment." *Id.*  "It discriminates against those candidates - and of particular importance - against those voters whose political preferences lie outside the existing political parties." *Id.*

While a 10% polling threshold may not be *ipso facto* impermissible, the fact that it was generated _after_ the invitations were extended to other candidates, and was based on researching previous election results to exclude third party

41

candidates, is a clear indication of viewpoint discrimination and unreasonableness.

Moreover, the imposition of 10% criteria, $100,000.00 fundraising requirement,

and the mid-August deadline taken together is unconstitutional. As noted by the

*Blackwell* Court, voter interest is not as intense more than 60 days prior to an

election. *Id.*, 462 F.3d at 586. More importantly, until Patterson actually qualified

for ballot access, he was simply not generally included in polling results, nor did

his candidacy generate the "buzz" that would drive polling numbers up. *Id.* at 588.

Polling is not done – period – on write-in candidates.

Thus, the requirement to gather 5,000 "good" signatures by Tuesday, August

12, 2014, coupled with the requirement to poll over 10% three days later,

discriminates against third party candidates.[182] *Id.* Having gathered the support for

ballot access, Patterson was then required to raise $100,000.00, and achieve polling

results at or above 10% by the following Friday. *Id.* The 10% polling criteria and

contribution requirement, coupled with the deadline, would necessarily exclude

third party candidates, regardless of their actual levels of support. *Id.*

---

[182] KET misleadingly argued below that Mr. Patterson had all the time in the
world to gather signatures and raise money. Not so. First, he was not nominated
by the LPKY as the candidate until March 2014. No candidate who runs as a party
candidate would gather signatures until after the party nominates. Nor are 5,000
good signatures gathered overnight. But more to the point, KET never told
Plaintiffs (or the public) that Patterson needed to raise $100,000 and poll at 10% in
early 2014, so that he could have endeavored to meet the criteria.

These criteria were not meant to be objective indicators of public support. Given the facts and reasonable inferences, these criteria were merely set so that Patterson could not participate, regardless of any level of support he generated. The criteria together were unconstitutional and the District Court erred in upholding them.

D.    Equal Protection was Violated and Appropriately Plead

Equal protection jurisprudence has typically been concerned with governmental classifications that "affect some groups of citizens differently than others." *McGowan v. Maryland*, 366 U.S. 420, 425 (1961).  *See, e.g., Ross v. Moffitt*, 417 U.S. 600, 609 (1974) ("'Equal Protection' . . . emphasizes disparity in treatment by a State between classes of individuals whose situations are arguably indistinguishable"); *San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 60 (1973) (Stewart, J., concurring) ("[T]he basic concern of the Equal Protection Clause is with state legislation whose purpose or effect is to create discrete and objectively identifiable classes").  Plaintiffs in such cases generally allege arbitrary classification as members of an "identifiable group." *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).  The group in this case is the Libertarians.

The 10% polling criteria is greater than the 5% actual voting results typically approved for third parties for ballot access, as approved in *Jenness v. Fortson*, 403

43

U.S. 431, 437-438 (1971).  Criteria at 15% have been found unconstitutional. *Williams v. Rhodes*, 393 U.S. 23, 24-25 (1968).

Following *Jenness*, *Storer* and *Williams*, federal courts have invariably struck down ballot access schemes that require a showing of support from more than five percent of the eligible voters in an election. *See*, *e.g.*, *Lee v. Keith*, 463 F.3d 763 (7th Cir. 2006) (striking down law requiring showing of support equal to 10 percent of last vote); *Obie v. North Carolina State Bd. of Elections*, 762 F. Supp. 119 (E.D.N.C. 1991) (striking down law requiring showing of support equal to 10 percent of registered voters); *Greaves v. State Bd. of Elections of North Carolina*, 508 F. Supp. 78 (E.D.N.C. 1980) (striking down law requiring showing of support equal to 10 percent of last gubernatorial vote); *Lendall v. Jernigan*, 424 F. Supp. 951 (E.D. Ark. 1977) (striking down law requiring showing of support equal to 10 percent of last gubernatorial vote); *American Party of Arkansas v. Jernigan*, 424 F. Supp. 943 (E.D. Ark. 1977) (striking down law requiring showing of support equal to 7 percent of last gubernatorial vote); *Lendall v. Bryant*, 387 F. Supp. 397 (E.D. Ark. 1974) (striking down law requiring showing of support equal to 15 percent of last gubernatorial vote); *Socialist Labor Party v. Rhodes*, 318 F. Supp. 1262 (S.D. Ohio 1970) (striking down law requiring showing of support equal to 7 percent of last gubernatorial vote).

Moreover, the imposition of one set of criteria, to invite (or exclude) one set of candidates (i.e. incumbents and major party candidates) and another set of criteria to invite (or exclude) other candidates, impinges on fundamental rights. These rights include the right to associate, the right to vote, and the right to communicate to voters under the First Amendment and, as such, are subject to strict scrutiny. *Harper*, 383 U.S. 663, 670 (1966). The application of one set of criteria to one set of candidates, and another more stringent set of criteria to a second set of candidates, cannot and does not meet a compelling state interest and, therefore, is unconstitutional.

Furthermore, a valid claim under the Equal Protection Clause exists where there is a showing of a person being "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (*citing Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441 (1923), and *Allegheny Pittsburgh Coal Co. v. Commission of Webster Cty.*, 488 U.S. 336 (1989)).

There is also precedent for importing scrutiny levels from First Amendment cases when an equal-protection challenge implicates First Amendment rights. *Police Department of the City of Chicago v. Mosley*, 408 U.S. 92 (1972), involved an "equal protection claim [that was] closely intertwined with First Amendment interests." *Id.* at 95. In that case, the Supreme Court considered a law that

45

"exempt[ed] peaceful labor picketing from its general prohibition on pikceting [*sic*] next to a school." *Id.* at 94. Applying the First Amendment standard from *United States v. O'Brien*, 391 U.S. 367 (1968), the *Mosley* Court concluded that the ordinance "impose[d] a selective restriction on expressive conduct far 'greater than is essential to the furtherance of (a substantial governmental) interest.'" *Mosley*, 408 U.S. at 102. On this basis, it held that "under the Equal Protection Clause, [the ordinance] may not stand." *Id.; see also Rhodes*, 393 U.S. 23, 30-31 ("[F]reedom protected against federal encroachment by the First Amendment is entitled under the [Equal Protection Clause of the] Fourteenth Amendment to the same protection from infringement by the States.").

There is no rational basis for imposition of one set of criteria for one set of candidates, and another more difficult set of criteria for another set of candidates.

It is likely Defendants will cite cases that deal with the imposition of previously-established criteria, applicable to all candidates, and adopted and established prior to anyone being invited to a debate. That is not what happened here. What happened here was invitations were extended to Senator McConnell and Secretary Grimes in February 2014, under no, or less restrictive, criteria, conditioned only on their winning their primary elections; then, another more stringent set of criteria were subsequently created to exclude Patterson. That is the essence of the equal protection claim. The District Court erred in dismissing it.

46

E.    Due Process was Violated and Appropriately Plead

Defendants failed to notify Plaintiffs of the new criteria they established to exclude Patterson.[183]  Plaintiffs were entitled to notice and an opportunity to meet such criteria under clearly established law set forth in *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).  "Parties whose rights are to be affected are entitled to be heard." *Baldwin v. Hale*, 68 U.S. (1 Wall.) 223, 233 (1863); *Jones v. Flowers*, 547 U.S. 220, 235 (2006) (notice must be given where practical).

The Fourteenth Amendment requires that citizens receive due process when the government takes action that infringes upon their fundamental rights. *Board of Regents v. Roth*, 408 U.S. 564 (1972).  Plaintiffs had a legitimate claim to attend the debate.  Patterson had achieved ballot access, which had always been enough in prior years to achieve debate participation.  Further, Patterson was running as a member of the third-largest political party in the country.  Patterson won his party's nomination, just as Senator McConnell and Secretary Grimes had.  Plaintiffs had a legitimate campaign and were seeking a pivotal elected office.  They had every reason to believe their ideas and viewpoints would receive as much respect and consideration from Defendants as the two "main party" candidates received.

---

[183] The District Court's February, 2016 decision does not address the due process claim.  [Order, RE#47, PAGEID#1676-1697].  However, the District Court later informed the parties, in denying a motion for reconsideration, that it did, in fact, address the claim and had dismissed it.  [Order, RE#99, PAGEID#4171].

47

Due process generally requires notice and a hearing before the government deprives a citizen of his or her property. *Thomas v. Cohen*, 304 F.3d 563, 576 (6th Cir. 2002). Here, Defendants adopted more stringent criteria, without notice to Mr. Patterson, in order to ensure his exclusion from the debate.

Pursuant to past policy, practice and procedure of KET, Patterson, having qualified for the general election ballot and having met the March 2014, criteria ostensibly used to invite the two major party candidates, had a protectable property interest in his participation in the October 13, 2014, debate.

Finally, there can be no due process if there is no notice of the procedures in place. The seminal procedural due process cases all implicitly require that a person be given notice when his property interests are adversely affected. *Roth*, 408 U.S. 564; *Eldridge*, 424 U.S. 319. Significantly, KET never made public the August 15, 2014, deadline and criteria, nor did it directly inform Patterson of them until it was too late.

Instead, on July 16, 2014, KET adopted a deadline of August 15, 2014, through an exchange of intra-office emails. Defendants were aware of Patterson's candidacy, as evinced by the June 5, 2014, email confirming that they would not invite him regardless of the criteria used. They could have sent known candidates an email or even posted the criteria and deadline on KET's website. Instead, they kept the deadline and criteria completely secret from Mr. Patterson and the public.

48

Defendants' failure to give Mr. Patterson, and the public, notice of their criteria deprived Plaintiffs of the minimal due process of advance notice to which they were entitled.

### F.    Goodman was erroneously dismissed

The District Court dismissed Goodman, positing that "[t]he complaint mentions Goodman on four occasions," and thus he was not sufficiently implicated in the allegations to be liable.[184]  As noted in the factual background above, it was error to dismiss the allegations against Goodman, because the allegations were explicit regarding his involvement and participation, and the inferences drawn from the allegations and attached exhibits in Plaintiffs' favor likewise foreclosed his dismissal.

A complaint must allege sufficient facts that, accepted as true, "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  When determining facial plausibility, the court must construe the complaint in the light most favorable to the plaintiff – including drawing competing factual inferences in favor of the plaintiff and accepting as true the factual allegations in the complaint.

---

[184] (Order, RE#47, PAGEID#1685).

*Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008). Applying this standard,

Plaintiffs sufficiently stated an individual capacity claim against Mr. Goodman.

The District Court erred in dismissing him.

## II.   The District Court erred in granting summary judgment to the other individual capacity Defendants

Summary judgment is a question of law, that this Court reviews *de novo*.

*Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 565 (6th Cir. 2016).

Furthermore, all facts, and all inferences from those facts, must be construed most

strongly in favor of the non-moving party – in this case, Plaintiffs. *Id.*

Credibility determinations are "jury functions, not those of a judge." *Reeves*

*v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000). Where questions

exist regarding the credibility of witnesses and the weight of evidence, such

matters must await trial and not be determined on motion for summary judgment.

*Dawson v. Dorman,* 528 Fed. Appx. 450, 452 (6th Cir. 2013), *citing Anderson v.*

*Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986)(Courts may not resolve credibility

disputes on summary judgment).

### A.   There is sufficient evidence, construed most favorably in Plaintiffs' favor, to demonstrate a First Amendment violation

The Supreme Court recognizes that "candidate debates are of exceptional

significance in the electoral process." *Forbes*, 523 U.S. 666, 675. Unlike "other

broadcasts, the debate was by design a forum for political speech by the

candidates." *Id.* Thus, "[t]o be consistent with the First Amendment, the exclusion of a speaker from a nonpublic forum must not be based on the speaker's viewpoint and must otherwise be reasonable in light of the purpose of the property." *Id.* at 682. And, in *Forbes*, questions of fact were resolved by a jury, which determined "Forbes' exclusion was not based on 'objections or opposition to his views.'" *Id.*

Viewpoint discrimination, and the targeting of particular candidates and political parties, cannot be, and is not, permissible. *Id. Forbes* also establishes that a public access broadcaster may discriminate against candidates based on levels of public support as long as the restrictions are reasonable; however, a public access broadcaster may not "suppress expression" because the "public officials oppose the speaker's view." *Id.* at 677. The *Forbes* Court noted that "[a] broadcaster cannot grant or deny access to a candidate debate on the basis of whether it agrees with a candidate's views." *Id.* at 676. Likewise, it is improper to exclude a candidate by "manipulating" the political process or because of "political pressure inside or outside" of the public broadcaster. *Id.* at 681. The rights set forth in *Forbes* are thus clearly established.

A political party, and the candidates who represent it and its platform, "is nothing more than an aggregation of political and legal positions, a shorthand way of announcing one's views on *many* topics of the day." *Carey v. Wolnitzek*, 614

51

F.3d 189, 202 (6th Cir. 2010) (Court's emphasis).  *See also Denver Area Educ. Telcoms. Consortium v. FCC*, 518 U.S. 727, 770 (1996) ("[i]f the Government spared all speech but that communicated by Republicans from the control of the cable operator, for example, the First Amendment violation would be plain").

Viewpoint discrimination occurs when the government "targets not subject matter, but particular views taken by speakers on a subject." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).  *See also Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 82 (1st Cir. 2004) (explaining that the government engages in viewpoint discrimination when it suppresses speech because it disagrees with "the underlying ideology or perspective that the speech expresses"). Viewpoint discrimination is anathema to free expression and is impermissible in both public and nonpublic fora.  *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992).  *See also Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 392-93 (1993) (where government allowed nonpublic forum to be used for discussion of certain subjects, it could not deny access to those wishing to discuss the subjects from a religious standpoint).

"Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010). "Prohibited, too, are restrictions distinguishing among different speakers, allowing speech by some but not others." *Id.*  "As

instruments to censor, these categories are interrelated: Speech restrictions based on the identity of the speaker are all too often simply a means to control content." *Id.*

"Quite apart from the purpose or effect of regulating content, moreover, the Government may commit a constitutional wrong when by law it identifies certain preferred speakers." *Id.* at 341. "By taking the right to speak from some and giving it to others, the Government deprives the disadvantaged person or class of the right to use speech to strive to establish worth, standing, and respect for the speaker's voice." *Id.* "The Government may not by these means deprive the public of the right and privilege to determine for itself what speech and speakers are worthy of consideration. The First Amendment protects speech and speaker, and the ideas that flow from each." *Id.*

Like religion, a political platform and party "also provides, as it did here, a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered." *Rosenberger*, 515 U.S. 819, 831. And thus discrimination on that basis was viewpoint discrimination.

Moreover, "[t]he existence of reasonable grounds for limiting access to a nonpublic forum, however, will not save a regulation that is in reality a facade for viewpoint-based discrimination." *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 811 (1985).

53

The law is clear: public broadcasters cannot exclude candidates based on their viewpoints and, likewise, cannot create criteria that, although objective on their face, have the aim and purpose of excluding candidates based on their views. Such pre-textual viewpoint discrimination is impermissible. *Forbes*, 523 U.S. at 676; *Pittsburgh League of Young Voters Educ. Fund v. Port Auth.*, 653 F.3d 290 (3d Cir. 2011) (discussion of pretext and viewpoint discrimination); *Children First Found., Inc. v. Legreide*, 373 Fed. Appx. 156 (3d. Cir. 2010) (discussing pretext in viewpoint discrimination). Indeed, the "recitation of viewpoint-neutral grounds may be a mere pretext for an invidious motive." *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 86 (1st Cir. 2004). "In practical terms, the government rarely flatly admits it is engaging in viewpoint discrimination." *Id. See also Mesa v. White*, 197 F.3d 1041 (10th Cir. 1999). *See, also, Ward v. Polite*, 667 F.3d 727 (6th Cir. 2012) (explaining in a First Amendment pretext case that inferences can be drawn either in favor of, or against, either side).

Such viewpoint discrimination occurs when the government restricts speech because of "the specific motivating ideology or the opinion or perspective of the speaker," *id*., *Bailey v. Callaghan*, 715 F.3d 956 (6th Cir. 2013); *citing Cornelius*, 473 U.S. 788, 806.

The evidence here demonstrated a course of conduct from the start to impose criteria as a pretext, where the true aim was to discriminate based on viewpoints.

54

Defendants engaged in viewpoint discrimination in 2012, when they excluded the anti-abortion candidates (to some an objectionable viewpoint).  Defendants told their attorney they wanted to make sure those candidates did not appear again in 2014, and they wanted to exclude an "eccentric" candidate – Sterling or Farnsley, and wanted criteria to justify it.  They then designed their 2/3/14 Criteria to exclude Farnsley and Sterling and, when it was not clear this would have the intended effect, they ratcheted up their efforts by changing the criteria two days later, on 2/5/14, to require a website, the intent of which was to exclude Farnsley.

When Brower presented these criteria to Hopkins in March 2014, he was sure to mention that they had implemented a ban on out of state candidates – code speak for preventing 2014 anti-abortion candidates.  When the criteria did not exclude Sterling, and appeared not to exclude Patterson, Defendants again made changes.  They wanted to ensure those viewpoints were not represented (both Patterson and Sterling were anti-abortion candidates).

The criteria were altered –repeatedly -- with an all too apparent intent to ensure that candidates other than Senator McConnell and Secretary Grimes did not, and would not, appear.  How do we know?  Defendants tell us as much – that regardless of any criteria they "did not and will not" invite Patterson (Lib).  After all, their Board member was also clear, she wished there was No Libertarian.  And, well aware that the law prevented viewpoint discrimination, which Defendants had

55

engaged in, Goodman asked his friend about invoking the 5th Amendment right against self-incrimination prior to his testimony in this matter.

The District Court reasoned that this candid statement by Goodman to his friend was irrelevant because, in the end, Goodman did not, in fact, assert the Fifth Amendment. Quite right! As his email states, he met with his attorneys later that day, who likely informed him it was not a criminal law that Goodman violated when he and his cohorts ignored Todd Gray's advice and excluded candidates based on their viewpoints, but the civil law and constitutional law. The reasonable inference, however, can be drawn that it was nevertheless a knowing violation by Goodman of just that law, and the District Court erred in granting summary judgment.

In light of this evidentiary standard, it is difficult, if not impossible, to swallow the self-serving version of facts put forth by Defendants and adopted by the District Court. The exclusion of Patterson had nothing to do with public support, or lack thereof. His exclusion had everything to do with Defendants' goal to exclude all views other than those espoused by Senator McConnell and Secretary Grimes. Goodman testified as much – maybe a separate program would be available if a candidate met the criteria.

B.    Defendants' Criteria Are Unreasonable And, Consequently, They Are Not Entitled To Qualified Immunity

Defendants' criteria are not reasonable under *Forbes*, 523 U.S. at 682. Imposing criteria that exclude, based on historical records, even the most successful of third party candidates in Kentucky (namely Gatewood Galbraith during in his 2011 Gubernatorial run) is not reasonable.  The criteria were designed to, and actually did, exclude all but the mainstream viewpoints.  Unlike *Forbes*, where the candidate had no campaign to speak of, these criteria exclude the most serious third party and independent candidates, and did so with an early deadline designed to ensure that third party and independent candidates do not appear.

Defendants literally rested their entire argument on the 11th Circuit Court of Appeals' decision of *Chandler v. Georgia Public Telecommunications Com.*, 917 F.2d 486 (11th Cir. 1990).  In *Chandler*, the testimony demonstrated a purposeful effort to exclude the viewpoints of the Libertarian candidates.  We know the U.S. Supreme Court indicated that such viewpoint discrimination was not permissible in the context of candidate debates in *Forbes*, issued a few years later.  *Forbes*, 523 U.S. at 682.  *See also Arons v. Donovan*, 882 F. Supp. 379, 389-390 (D.N.J. 1995) (court rejected *Chandler* in light of *Forbes*, holding that a public broadcaster may not make a content-based decision to exclude third parties because that would constitute viewpoint-restrictive and violate First Amendment rights).

57

*Chandler* is also inconsistent with the statement by the concurrence in U.S. Supreme Court in *Denver Area Educ. Telcoms. Consortium v. FCC*, 518 U.S. at 770: "[i]f the Government spared all speech but that communicated by Republicans from the control of the cable operator, for example, the First Amendment violation would be plain." A panel of this Court also observed that a political party, and the candidates who represent it and its platform, "is nothing more than an aggregation of political and legal positions, a shorthand way of announcing one's views on *many* topics of the day." *Carey*, 614 F.3d 189, 202.

Defendants were not entitled to qualified immunity on the viewpoint discrimination claims. They violated the Plaintiffs' constitutional rights, and it was clearly established that viewpoint discrimination was not permissible when they violated it. *Wesley v. Campbell*, 779 F.3d 421, 428, 433 (6th Cir. 2015) (explaining two tier qualified immunity inquiry); *Harris v. City of Circleville*, 583 F.3d 356, 366-67 (6th Cir. 2009). To make this assessment, this Court looks to decisions of the Supreme Court, its own decisions, and finally to decisions of other circuits. *Daugherty v. Campbell*, 935 F.2d 780, 784 (6th Cir. 1991).

There need not be a prior case directly on point for a law to be clearly established; generalized statements of the law or a general constitutional rule already identified in the decisional law are sufficient. *Kennedy v. City of Cincinnati*, 595 F.3d 327, 337 (6th Cir. 2010). *See also McGlone v. Bell*, 681 F.3d

58

718 (6th Cir. 2012) (First Amendment case, no qualified immunity); *Ward*, 667

F.3d 727 (First Amendment pretext viewpoint case; no qualified immunity).

Plaintiffs' allegations involve rights that have been articulated and

established in both U.S. Supreme Court and Sixth Circuit precedent.  See, e.g.

*Forbes*, 523 U.S. 666, 682; *Denver Area Educ. Telcoms. Consortium*, 518 U.S.

727, 770; *Ward*, 667 F.3d 727.  The evidence, and reasonable inferences drawn in

Plaintiffs' favor, demonstrate that a reasonable fact finder could find a violation of

these rights.

### III.    The District Court erred in failing to grant the FRCP 59(e)/Motion for Reconsideration and/or Motion to Amend

This Court reviews the denial of a Rule 59(e) motion for abuse of discretion,

reversing only when the district court (1) relies on clearly erroneous findings of

fact, (2) improperly applies the law, or (3) uses an erroneous legal standard. *Nolfi*

*v. Ohio Ky. Oil Corp.*, 675 F.3d 538, 552 (6th Cir. 2012); *Intera Corp. v.*

*Henderson*, 428 F.3d 605, 619-20 (6th Cir. 2005).

As noted above, the denial of the Motion for Reconsideration was predicated

on the District Court's improper application of the law and use of an erroneous

legal standard.

Furthermore, the Motion to Amend was erroneously denied when new

evidence came to light that colored the allegations at issue.  Despite the fact that an

amended pleading was attached to that motion, the District Court reasoned that it

was necessary for both the motion to amend, and motion for reconsideration, for

Plaintiffs to specifically pin-cite to the new evidence they had uncovered in their

initial motion (even though they did exactly that in opposition to Defendant's

Motion for Summary Judgment), *citing Penn, LLC v. Prosper Bus. Dev. Corp.*, 600

Fed. Appx. 393, 403 (6th Cir. 2015), which has nothing to do with motions to

amend, but rather deals with the requirement to cite to the record in appellate

briefing.  In the end, all that was necessary was to look at the amended pleading

and determine whether it stated a claim, or not.

## CONCLUSION

The judgment of the District Court should be reversed.  This matter should

be remanded to the District Court for further proceedings.

Respectfully submitted,

/s/ Thomas B. Bruns
Thomas B. Bruns (KBA #84985)
Bruns, Connell, Vollmar & Armstrong, LLC
4750 Ashwood Drive, Suite 200
Cincinnati, OH 45241
(513) 312-9890
(513) 800-1263 (fax)
tbruns@bcvalaw.com

/s/ Robert A. Winter, Jr.
Robert A. Winter, Jr. (KBA 78230)
P.O. Box 175883
Fort Mitchell, KY 41017-5883
(859) 250-3337
robertawinterjr@gmail.com
*Attorneys for Plaintiffs/Appellants*

60

## CERTIFICATE OF COMPLIANCE WITH
## FED. R. APP. P. 32(a)(7)(B) AND 6TH CIRCUIT RULE 32(a)

This brief complies with the type-volume limitations of Fed. R. App. P 32(a)(7)(B) because it contains 12,901 words, excluding the parts of the brief exempted by 6th Cir. R. 32(a).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Office Word 7.0 in 14 point Times New Roman font.


/s/ Robert A. Winter, Jr._____
Robert A. Winter, Jr. (#78230)
Counsel for Appellants
January 17, 2018


## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of January 2018, the foregoing Brief was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/Robert A. Winter, Jr._____
Robert A. Winter, Jr.

61

# APPENDIX -- DESIGNATION OF THE DISTRICT COURT RECORD

Plaintiffs/Appellants, pursuant to Sixth Circuit Rule 30(g), designate the

following filings from the district court's electronic record:

| Document Description | Record Entry No. | PAGEID |
|---|---|---|
| Complaint | RE#1 | 1-102 |
| Depo. David Patterson | RE#25 | 555-593 |
| Depo. Ken Moellman | RE#26 | 653-1036 |
| FRCP 30(b)(6) Depo. Of KET (deponent, William Goodman) | RE#27 | 653-1036 |
| Order RE: TRO | RE#28 | 1037-1054 |
| Amended Complaint | RE#41 | 1459-1534 |
| Motion to Dismiss | RE#42 | 1535-1587 |
| Answer | RE#43 | 1588-1606 |
| Response in Opposition to Motion to Dismiss | RE#44 | 1607-1645 |
| Reply in Support of Motion to Dismiss | RE#46 | 1661-1675 |
| Order Granting in Part Motion to Dismiss | RE#47 | 1676-1697 |
| Agreed Order re: Schedule | RE#52 | 1721-1723 |
| Agreed Order re: Extension | RE#72 | 2246-2248 |
| Defendants Motion for Summary Judgment | RE#73 | 2249-2515 |
| Depo. Goodman And Exhibits | RE#75 | 2518-3276 |
| Depo. Brower | RE#76 | 3277-3403 |
| Depo. Clark, Part 1 | RE#77 | 3404-3509 |
| Depo. Clark, Part 2 | RE#78 | 3510-3542 |
| Depo. Bischoff | RE#79 | 3543-3623 |
| Depo. Hopkins | RE#80 | 3624-3671 |
| Depo. Gray | RE#81 | 3672-3870 |
| Plaintiffs Motion Amend/Reconsider | RE#82 | 3871-3950 |
| Order re: Exhibits from Goodman Depo. Applying to other depos. | RE#84 | 4016 |
| Memo. Opposition Def's MSJ | RE#87 | 4025-4083 |

| Declaration Winter with Goodman Email | RE#87-1 | 4056-4058 |
| Declaration Moellman | RE#87-2 | 4059-4082 |
| Memo. Opp. Reconsideration/Amend | RE#88 | 4084-4124 |
| Reply in Support of Reconsideration | RE#91 | 4129-4134 |
| Reply in Support of MSJ | RE#92 | 4135-4150 |
| Order & Opinion Denying Motion to Amend/Reconsideration | RE#98 | 4161-4168 |
| Order & Opinion Granting Defs MSJ | RE#99 | 4169-4183 |
| Judgment | RE#100 | 4184 |
| Notice of Appeal | RE#102 | 4205-4206 |

/s/Robert A. Winter, Jr._____
Robert A. Winter, Jr.